UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

RANDY JOE BOWEN,

     Plaintiff,                        Case No. 3:23-cv-375

vs.

SIDNEY POLICE DEPARTMENT, *et al.*,       District Judge Michael J. Newman

     Defendants.

---

## ORDER: (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 17); (2) GRANTING DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT (Doc. No. 19); AND (3) TERMINATING THIS CASE ON THE DOCKET

---

This civil case arises from the police response to reports that Plaintiff Randy Joe Bowen was intoxicated and threatening to physically harm a woman and her children who lived with him in his home. *See infra*, § I. Officer Haydon Bronne initially investigated the reports by talking with several of Bowen's neighbors. *Id*. Bowen was not home at the time. Later, having learned that Bowen had returned home, Officer Bronne went to Bowen's home. *Id*. As Officer Bronne walked towards Bowen's front door, he heard a woman scream from inside the home. *Id*. Officer Bronne, facing a rapidly evolving situation, made a split-second decision to enter Bowen's home without a warrant. *Id*. Bowen challenges much of what happened next. He mainly asserts Bronne, and another soon-arriving officer, used excessive force—including, in part, tasering Bowen in the back—to subdue and arrest him. *See id*.

Bowen brings this case *pro se* under 42 U.S.C. § 1983 claiming Defendants—the City of Sidney, Ohio Police Officers Bronne, Joseph Kennedy, Brandon Heindl, and Jordan Fox ("Defendants")—violated his rights under the Fourth and Fifth Amendments to the United States

Constitution.[1]  Doc. No. 3.  The case is before the Court upon the parties' cross motions for summary judgment (Doc. Nos. 17, 19), their memoranda in opposition (Doc. Nos. 22, 23), and Defendants' reply[2] (Doc. No. 24).  The parties' cross motions are ripe for review.

## I.

The following factual discussion rests upon the evidence submitted in support of the parties' cross motions.  This includes, among other items, six videos taken by Defendants' body-worn cameras.  The Court has scrutinized each video along with the other evidence of record and Bowen's filings.

Ordinarily, as in this case, when a motion for summary judgment is based on qualified immunity, this Court views the facts in the light most favorable to the plaintiff.  *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) (citing *Scott v. Harris,* 550 U.S. 372, 378 (2007)).  However, given the video of Bowen's arrest from multiple officers' body cameras, the following factual discussion is mainly based on the facts "in the light depicted" by the video evidence.  *Scott*, 550 U.S. at 380-81; *see Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017).  Still, "any relevant gaps or uncertainties left by the videos [are viewed] in the light most favorable to the Plaintiff."  *Latits*, 878 F.3d at 544 (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)).  Further, given that Plaintiff is proceeding *pro se*, his pleadings and filings are liberally construed in his favor to the

---

[1] The Court previously dismissed with prejudice Bowen's § 1983 claims and state law claims against Officers Anderson and Heindl.  Doc. Nos. 5, 8 at PageID 115.  Liberally construing Bowen's *pro se* motion for summary in his favor, he asserts a Fourth Amendment claim against Officer Heindl for trying to cover up the injury to his finger.  *See* Doc. No. 17 at PageID 168.  Defendants urge the Court not to address this new claim against Heindl, a previously dismissed party.  Doc. No. 23 at PageID 296.  Because Bowen is proceeding *pro se*, and because it appears he did not raise this claim until after viewing the video evidence, justice requires consideration of this claim.  *See* Fed. R. Civ. P. 15(a) ("The court should freely grant leave to [to amend a pleading] when justice so requires").  For the reasons made clear in this opinion, *see infra*, § IV(C), this claim is subject to summary judgment.

[2] Bowen did not file a reply in support of his motion for summary judgment, and the time for him to do so has passed.  See S.D. Ohio R. 7.2(a)(2).

2

extent they do not conflict with *Scott* or post-*Scott* Sixth Circuit precedent. *See, e.g.*, *Latits*, 878 F.3d at 544; *cf. Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (*per curiam*) ("A document filed *pro se* is 'to be liberally construed[.]" (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976))); *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999) ("*Pro se* plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings").

### A. The Initial Events

On August 16, 2022, police received a report of a domestic disturbance at 1045 Buckeye Avenue in Sidney, Ohio, Bowen's residence. *See* Doc. No. 19-1 at PageID 197. Officer Bronne responded to the address of Bowen's neighbors (1047 Buckeye Avenue) where he learned that Jessica Hawkins, who lived with Bowen at 1045 Buckeye Avenue, had come to the neighbor's "door seeking help and shelter and that … Bowen had been striking her and their children." Doc. No. 19-2 at PageID 198 (Bronne's Decl.); *see* Bronne Video 2, Doc. No. 19-1, Exhibit A, Ikena_Bronne B 2.processed.fts-00-00-00.enh.

One man reported to Bronne that they let Hawkins "into their home after hearing what they believed to be sounds related to a struggle." Doc. No. 19-2 at PageID 198; *see* Bronne Video 2. Bronne also learned that after Hawkins was inside her neighbor's house, Bowen arrived, forced the door open and entered the house without permission. Bronne Video 2. Those inside repeatedly told him to leave. *Id.*; *see* Doc. No. 19-2 at PageID 199. When they told Bowen the police were responding, he left, got into Hawkins' truck, and drove away. Doc. No. 19-2 at PageID 199. Neighbors told Bronne that Bowen was intoxicated and did not have a valid drivers' license. *Id.*; Bronne Video 2.

Before Bronne left the scene, he asked the neighbors and Hawkins to contact him if Bowen returned. Doc. No. 19-2 at PageID 199. Shortly after Bronne left the area, he was informed Bowen had returned to his residence at 1045 Buckeye Avenue. *Id.* Consequently, Bronne responded to

that address at approximately 11:45 p.m.  *Id*.; Doc. No. 3 at PageID 64.

**B. Bowen's Return Home**

Video footage from Bronne's body camera reveals that as he approached the front door to Bowen's residence, an unidentified woman screamed from inside the house.  Bronne Video 1, Doc. No. 19-2, Exh. A, Ikena_Bronne Video 1.processed.fts-00-00-00.enh.  Bronne radioed for additional officers to "step it up," meaning officers "should expedite their response based on an apparent danger or esclat[ed] risk."  Bronne Video 1; *see* Doc. No. 19-2 at PageID 199.

Bronne tried opening the door but found it locked.  Bronne Video 1.  He then knocked and an unidentified woman began loudly weeping from inside the house.  *Id*.  A few seconds later, Bowen partially opened the door.  *Id*.  Bronne states in his sworn declaration, "Bowen opened the door wide enough for me to see Jessica Hawkins lying on the ground behind him."  Doc. No. 19 at PageID 199, ¶ 11.  Video footage does not confirm or refute whether Hawkins was lying on the floor at the moment Bowen partially opened the door.  Bronne Video 1.  Bronne ordered Bowen to "step out."  *Id*.  Bowen responded, "No, I won't," and then quickly shut the door.  *Id*.  In his declaration, Bronne states that Bowen "closed and locked the front door."  Doc. No. 19 at PageID 199, ¶ 14.  Video footage reveals that Bowen closed the front door but does not confirm or refute whether he locked it.  Bronne Video 1.

Bronne kicked the door partially open.  *Id*.  Bowen briefly tried to push it closed, thus attempting to keep Bronne from entering the house.  *See id*.  Bronne again radioed for officers to "step it up" and stepped forward into Bowen's residence.  *Id*.  Video footage shows that as Bronne entered, a white blanket lay nearby on the floor and a woman stood farther back in the room behind a couch.  *Id*.

A pause is warranted here to note that the situation Bronne faced had rapidly evolved: only about 9 seconds passed from the moment he knocked on the front door to the moment he kicked it

partially open.  *Id*.  During several seconds of this time, Bronne waited for a response to his knock on the door.  *Id*.  Also, as Bronne entered the home, he could see enough of Bowen, who was partially behind the door, to reasonably infer that he was physically strong and somewhat overweight.  *See id*.  Bowen acknowledges that he was intoxicated at this time.  Doc. No. 22 at PageID 221.

### C.  Bowen's Arrest

At this point, Bronne's video footage is unclear for several seconds as he attempts to physically control Bowen.  *Id*.  As the two struggled, Bronne told Bowen to "quit resisting, turn over," as Bowen repeatedly said, "stop."  *Id*.  The two were located inside Bowen's house near the front door in a somewhat confined space.  *Id*.  Bronne soon had Bowen laying on the floor on his back with his arms in front of him.  *Id*.  Bowen said, "I did nothing wrong; what are you doing?" He then mumbled something and said, "hit me."  *Id*.  Bronne held each of Bowen's wrists and told him to roll over, but Bowen resisted.  *Id*.

Bronne states in his sworn declaration, "Due to noncompliance, I struck Bowen with a closed fist near his left eye."[3]  Doc. No. 19-2 at 200.  Bronne also secured Bowen's arms by crossing them in front of his chest.  Bronne Video 1.  He then moved Bowen onto his side.  *Id*. Bowen then appeared to settle down slightly, and Bronne rolled him onto his back.  *Id*.  Bronne uncrossed Bowen's arms, which were pointed towards the ceiling.  *Id*.  Yet, Bowen was not fully cooperating: he did not comply with Bronne's direction to roll over.  Nor did he allow Bronne to roll him over.  He, instead, continued to lay on his back and said, "quit, quit"; "cuff me or stop"; and "you're doing this," as Bronne again crossed Bowen's arms in front of his chest.  *Id*.

Bronne explains in his declaration that he did not handcuff Bowen in front of his body because "[h]andcuffing to the front of the body fails to inhibit or sufficiently mitigate the risk a

---

[3] It is not clear from the video when Bronne punched Bowen.  *See* Bronne Video 1.

suspect can pose to officers and others.  Additionally, the handcuffs themselves can be utilized as a weapon."  Doc. No. 19-2 at PageID 200.

Approximately forty-five seconds passed from the moment Bronne kicked the door partially open to when Bowen was on his back with his arms pointing towards the ceiling. Throughout these events, Bronne was the only officer on the scene.  *See id*.  At times, Bowen's speech is slurred.  This tends to confirm the neighbor's report that Bowen was intoxicated.  *See id*.

A few more seconds passed during which Bowen said, "I could kick you, but I'm not." Bronne Video 1.  Bronne calmly responded, "Yeah, I wouldn't recommend that."  *Id*.  Bowen loudly cursed at Bronne in response and told him to "cuff it."  *Id*.  Bowen continued to repeatedly tell Bronne to "cuff it" while his arms, still pointed towards the ceiling, moved slightly from side to side.  *Id*.  Bowen said, "Officer, I'm giving you a chance; officer, pull your cuffs out"; "I'm giving you a chance, what the f--ks wrong with you"; "cuff it"; "cuff it"; "one, two, cuff my f--k'n arms."  *Id*.

Next, Officer Kennedy arrived.  On his video, Bowen can be heard saying to Bronne, "cuff my f—k'n arms; I've done nothing wrong."  Kennedy Video (Doc. No. 19-2, Exh. A, Ikena_Joe Kenn.processed.fts-00-00-00.enhsaw).  As Kennedy entered the room, Bronne was on top of Bowen as he continued to lay on his back.  *Id*.  Kennedy grabbed Bowen's left arm and shouted, "Roll over or you're gonna get tased."  *Id*.  Bowen responded, "What do ya mean I'm gonna get tased?  I'm giving you my arms, dumbass."  *Id*.  At this point, the officers had partially moved Bowen onto his side with his back facing Kennedy.  Kennedy told Bowen two more times to "roll over or you're gonna get tased."  *Id*.  Bowen did not comply, and Kennedy tased Bowen in his back.[4]  *Id*.

---

[4] After officers escorted Bowen outside his residence, a paramedic removed two taser probes from his back. Heindl Video.

Other Officers soon arrived and ordered Bowen to roll over. *Id*. Rather than roll over, Bowen continued to respond, "What do you mean roll over?" Bronne Video 1; Kennedy Video. Officers Bronne, Kennedy, and Heindl struggled to roll Bowen over and a few seconds later succeeded. Kennedy Video. They positioned him laying face down on the floor. *Id*.

One officer told Bowen to put his arms behind his back. *Id*.; *see* Bronne Video 1. Bowen again called the officers "dumbasses." Heindle Video. Bowen continued to physically resist by tucking his left hand and wrist under the left side of his body and his right hand and wrist under the right side of his body. *See* Heindl Video; Kennedy Video; Ikena_Dembski .processed.fts-00-00-00.enh ("Dembski Video"). *Id*. The officer then told Bowen, "give me your arm." Heindl Video. Bowen responded, "I'm going to give it to you." Heindle Video. It is not clear from Heindle's video footage whether Bowen "gave" the officer his left arm or whether the officer and Bowen together pulled Bowen's left arm from beneath his body. *See id*. Regardless, with Bowen's left hand and wrist no longer pinned beneath his body, the officer holding his left arm was able to handcuff Bowen's left wrist. *Id*. Because of Bowen's size, and likely to avoid injuring him, officers eventually used two sets of handcuffs connected together lengthwise to secure Bowen's hands behind his back. *See* Heindl Video.

Bowen soon sat up and began to stand, but an officer told him to sit. Bowen, while sitting, responded, "Oh, think you're bad, huh?" *Id*. The officer calmly replied, "No. I just want you to sit." *Id*. After a few seconds passed, Bowen tried to turn his body and look around, saying, "Where's he at? Where's he at?" *Id*. An officer told him to "stop, please." *Id*. Bowen more loudly asked, "Please what?" as he continued to turn his body while still sitting. *Id*. He then became more agitated and yelled, "I told you twice; no f—k'n reason." *Id*. He yelled, "I gave you my hands twice," followed by, "help me up, b--ch, help me up." *Id*. He was squirming at this point and an officer calmly told him to stop. *Id*. Bowen asked, "Why am I even bein' taken for?"

7

*Id*.  One officer told Bowen, "You're going to get up and walk to the car."  *Id*.  He replied, "No, I wanna know why, when I held my hands up … with the body cam."  *Id*.  The officers helped Bowen stand and, as they escorted him to a patrol car, he continued to verbally demean the officers. Bronne Video 1; Demski Video; Heindl Video.

In later-taken video footage, Officer Heindl stated to Plaintiff, "When I got here, you were fighting the other officers," and Bowen responded in agreement.  Heindl Video.

### D.  Bowen's Injury and Convictions

Officers transported Bowen to the hospital because he complained of an injury to one of his fingers and a finger on his left looked injured.  *See* Doc. No. 22-6 at PageID 277; Kennedy Video; Heindl Video.  In support of his motion, Bowen submits an x-ray of what looks like a dislocated finger on his right hand and two photographs appearing to show the same.  Doc. No. 22-6 at PageID 276-78.

When officers interviewed Hawkins, she stated that before Bronne arrived at the door, Bowen had thrown her against the door and onto the floor.  Bronne Video 1.  On October 11, 2022, nearly two months after his arrest, Bowen pled guilty in state court to two counts of domestic violence, a fourth degree felony.[5]  *See* Doc. No. 19-5 at PageID 206.  The court accepted his guilty pleas and sentenced him to two concurrent seventeen-month terms of imprisonment,[6] which he served.  *Id*. at PageID 214-15.

---

[5] Ohio's domestic violence statute, Ohio Rev. Code § 2919.25(A) provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member."

[6] Bowen claims he was never found guilty of domestic violence against Hawkins (Doc. No. 17 at PageID 167.  Public court records show otherwise.  *See https://co.shelby.oh.us/224/Search-Public-Records-Online* (*State of Ohio v. Randy Bowen,* Case No. 22CR178)*; see also* Doc. No. 19 at PageID 206-16.  Although the indictment filed in state court against Bowen does not name the household member he harmed, or attempted to harm, given his guilty pleas and the information reported to Bronne by his neighbors and the video evidence of record, there is no genuine dispute that Bowen was convicted of domestic violence against Hawkins and/or her children.  *See* Bronne Videos 1 and 2; *see also* Bronne Declaration (Doc. No. 19-2 at PageID 198-99).

## II.

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that no genuine issue of material fact is present, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At the summary-judgment stage, the burden is first on the moving party to conclusively show no genuine issue of material fact exists.  *Celotex*, 477 U.S. at 323; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).  The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations or admissions, interrogatory answers, or other materials," or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *See* Fed. R. Civ. P. 56(c)(1)(A) and (B) (citation modified).  Once the moving party accomplishes this, "the non-moving party may not rest upon [his or her] mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citation modified).  "There is no duty imposed upon the trial court to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992) (citation modified). Instead, "the free-ranging search for supporting facts is a task for which attorneys ... are equipped and for which courts generally are not."  *Id.* at 406.

The Court's standard of review does not change when the parties file cross motions for summary judgment. *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994) (quoting *Taft Broadcasting,* 929 F.2d at 248).

## III.

### A.  Bowen's Claims Against Officers Bronne, Kennedy, Heindl, and Fox

Construing Bowen's *pro se* filings liberally in his favor, *see Boswell*, 169 F.3d at 387, he raises four claims: (1) Officers Bronne and Kennedy used excessive force to effect his arrest in violation of the Fourth Amendment; (2) Officer Heindl attempted to cover-up Kennedy's excessive use of force in violation of the Fourth Amendment; (3) Bronne entered his home without a warrant in violation of the Fourth Amendment; and (4) Bronne failed to allow Bowen to remain in his residence and declined to speak with him in violation of the Fourth and Fifth Amendments.[7] Doc. No. 17 at PageID 167-70; Doc. No. 22 at PageID 224-30.

Bronne, Kennedy, and Heindl contend qualified immunity shields them from individual liability because they did not use excessive force when arresting Bowen and he has not identified a violation of his constitutional rights under clearly established law.  Doc. No. 19 at PageID 181-

---

[7] Although Bowen mentions in his complaint that Officer Fox might have dislocated his finger (Doc. No. 3 at PageID 66), Bowen did not pursue this allegation, or any related claim, in his motion for summary judgment.  *See* Doc. No. 17.  Instead, after he reviewed the video footage, he acknowledged it was not Officer Fox who used excessive force on him.  *Id*. at PageID 163.  In addition, Bowen did not oppose Defendants' contention that Fox is entitled to summary judgment on Bowen's excessive force claim.  For these reasons, Bowen has abandoned this excessive force claim against Fox, and Fox is entitled to summary judgment in his favor.  *See Brown v. VHS of Mich., Inc.*, 545 Fed. App'x 368, 372 (6th Cir. 2013); *Hicks v. Concorde Career Coll.*, 449 Fed. App'x 484, 487 (6th Cir. 2011) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment").

95; Doc. No. 23 at PageID 287-96; Doc. No. 24 at PageID 299-304.

**B.  Section 1983 and Qualified Immunity**

As noted at the outset, Plaintiff's federal constitutional claims arise under 42 U.S.C. § 1983.  *Supra*, p.1.  To establish a § 1983 claim, Bowen must show: (1) a violation of his rights secured by the Constitution or laws of the United States (2) committed by a person acting under color of state law.  *Littler v. Ohio Ass'n of Pub. School Emps.*, 88 F.4th 1176, 1180 (6th Cir. 2023).

The parties do not contest that Defendants acted under the color of state law at the relevant times in this case.  *See* Doc. Nos. 19, 23.  Defendants instead contend Bowen has not shown a violation of his constitutional rights.  *See id*.  Because of this, in Defendants' view, qualified immunity shields them from Bowen's § 1983 claims.  *See id*.

"'Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known.'"  *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

A two-pronged inquiry determines whether Defendants are entitled to qualified immunity: (1) "whether the facts that a plaintiff has … shown ... make out a violation of a constitutional right[;]" and (2) "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct."  *Hopkins v. Nichols*, 37 F.4th 1110, 1115 (6th Cir. 2022) (quoting *Pearson*, 555 U.S. at 232) (internal quotations omitted).  Plaintiffs bear the burden to satisfy both qualified immunity prongs.  *See Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018).  "In so doing, the plaintiff must, at a minimum, offer sufficient evidence to create a genuine issue of fact; that is, evidence on which a jury could reasonably find for the plaintiff."  *Id.* (citation modified) (quoting *Anderson*, 477 U.S. at 252).

11

# IV.

## A.  The Fourth Amendment and Excessive Force

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive use of force by law enforcement officers."[8] *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015) (citing *Cass v. City of Dayton*, 770 F.3d 368, 374 (6th Cir. 2014)).

"In reviewing an excessive force claim, a court must 'balance the government's interests in protecting others (including the police) and curbing crime against a suspect's right not to be injured.'" *Hart v. Mich.*, 138 F.4th 409, 417 (6th Cir. 2025) (citation modified) (quoting *Puskas v. Del. Cnty.*, 56 F.4th 1088, 1093 (6th Cir. 2023)). "This is a fact-intensive inquiry, requiring particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Taking into consideration 'that police officers are often forced to make split-second judgments' under 'tense, uncertain, and rapidly evolving' conditions, the 'particular use of force must be judged from the perspective of a reasonable officer on the scene,' not 'with the 20/20 vision of hindsight. *Id.* (quoting *Graham*, 490 U.S. at 396-97).

When a plaintiff alleges a police officer used excessive force in multiple instances, each instance is separately analyzed under the Fourth Amendment.  *Id.*  Doing so, the court "'carve[s] up the incident into segments and judge[s] each on its own terms to see if the officer was reasonable at each stage.'" *Id.* (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)).

---

[8] "All claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (citation modified).

"'When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately.'" *Id*. (quoting *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020)).

### B. Officer Bronne

Bowen argues that Bronne used excessive force in violation of the Fourth Amendment by (1) throwing him to the floor; (2) punching him in the face while straddling over him; and (3) holding him on the floor while Officer Kennedy tased him. Doc. No. 17 at PageID 168-69; Doc. No. 22 at PageID 226-27. He contends that Kennedy used excessive force by tasering him three times in the back and by pulling his fingers after he was handcuffed and dislocating one of his fingers. Doc. No. 17 at PageID 168.

Bronne contends that summary judgment is warranted in his favor based on qualified immunity because (1) under the *Graham*[9] factors Bronne and the other officers used objectively reasonable force to arrest Bowen; and (2) Bowen failed meet his burden to show that Bronne or Kennedy violated his clearly established constitutional rights. Doc. No. 19 at PageID 187-89, 193-94.

Viewing the evidence in Bowen's favor to the extent it does not conflict with the events in the video footage, *see Latits*, 878 F.3d at 544, and in the totality of the circumstances presented, the government's (here, the City of Sidney's) interests in protecting Hawkins and her children and in curbing domestic violence, outweigh Bowen's right not to be injured during his arrest. *See Hart*, 138 F.4th at 417.

Beginning with the severity of the crime at issue, *see Hart*, 138 F.4th at 417, Bronne had sufficient information to investigate whether Bowen had committed a very serious crime— domestic violence—against Hawkins or her children. *Cf. Georgia v. Randolph*, 547 U.S. 103, 117

---

[9] *Graham*, 490 U.S. at 396.

(2006) ("[W]e recognize that domestic abuse is a serious problem in the United States").  As will be discussed below, Bronne also had sufficient information to conclude that Bowen had engaged in, or was engaging in, domestic violence when he decided to arrest him. *Cf. id*., 547 U.S. at 118 ("No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists").

Next, considering the risk of harm Bowen posed, *see Hart*, an objective officer in Bronne's position, at the moment Bronne decided to use force, would understand that Bowen presented an imminent risk of harm to Hawkins and her children.  Bronne's video footage establishes that neighbors reported Bowen might be intoxicated; Hawkins had retreated from Bowen's home and sought refuge in her neighbor's home to avoid being harmed by Bowen; Bowen had committed bully-like behavior toward his neighbors, if not trespassing, by forcing his way into their home without invitation; and Bowen retreated from the neighbor's home, then departed the area in Hawkins' truck when told police were coming.  *See* Bronne Video 2;  *see also Puskas*, 56 F.4th at 1091, 1096-97 (holding the first *Graham* factor was satisfied in a domestic violence dispute where plaintiff had threatened his wife and had access to weapons); *see Siders v. City of Eastpointe*, 819 Fed. App'x 381, 389 (6th Cir. 2020) (finding officers had reasonable suspicion plaintiff had committed a violent domestic assault and had reason to physically seize plaintiff).

When Bronne later continued to investigate whether Bowen had harmed Hawkins or her children, he heard a woman, likely Hawkins, scream from inside Bowen's home.  Hearing this scream and knowing what the neighbors had previously reported about Bowen, an objective officer could reasonably conclude Bowen posed an imminent risk of harm to Hawkins or her children— or might actually be harming someone at that very moment.  Video footage further establishes after Bronne knocked on the door, a woman began crying from inside the home; Bowen then

14

partially opened the door, refused to step outside, and quickly closed the door. After Bronne kicked the door partially open, Bowen pushed it back, even if briefly,[10] towards Bronne, thus slowing his entrance into the home. Bronne Video 1. Given these undisputed facts, an objective officer, would reasonably understand that force was needed to control Bowen and protect Hawkins or her children from imminent, or actually occurring, violence.

The amount of force Bronne then used to subdue Bowen was objectively reasonable. This "tense, uncertain, and rapidly evolving," situation, *Puskas*, 56 F.4th at 1096—involving imminent or actually occurring domestic violence—justified Bronne's split-second decision to tackle Bowen and take him to the floor. Bowen's physical resistance, large size, and apparent strength, and the fact that Bronne was the only officer present, also justified his decision to punch Bowen in or near his eye while straddling him, to discourage Bowen from resisting any further and to protect himself and others inside the home. *See Schliewe v. Toro*, 138 Fed. App'x 715, 718, 722 (6th Cir. 2005) (finding officers did not use excessive force after punching plaintiff where plaintiff "behaved erratically during the evening and was apparently intoxicated").

Next, there is no genuine issue over the fact that Bowen physically resisted Bronne's efforts to subdue him. *See* Bronne Video 1; *see also* Bronne's declaration (Doc. No. 19-2 at PageID 199). As Bronne entered the home, Bowen briefly pushed the front door back towards Bronne. *See* Doc. No. 19-2 at PageID 199. Bowen asserts this was "the rebound of standing in the doorway and an unexpected door hitting his face, any person's natural reaction is to stop objects from hitting them again or in the first place." Doc. No. 22 at PageID 225. At best for Bowen, this shows that the

---

[10] Bowen disagrees with Defendants' assertion that he "tried to close the door." Doc. No. 22 at PageID 225. He argues Defendants "are mistaken from the rebound of standing in the doorway and an unexpected door hitting his face, any person's natural reaction is to stop objects from hitting them again or in the first place." *Id*. Accepting this as true, it is undisputed that Bowen at least briefly pushed the door back towards Bronne. Alternatively, assuming Bowen did not push back against the door, this does not negate the exigent circumstances justifying Bronne's decision to use force to enter Bowen's home and subdue him. *See Siders*, 819 Fed. App'x at 389; *see also infra*, § V(B).

naturally reactive "rebound" force he used to briefly push the door back against Bronne falls in the "gray area between active and passive resistance." *Feagin*, ---4th---,  2025 WL 2621665, at *10. "[B]ecause qualified immunity operates in the 'hazy border between excessive and acceptable force[,]" *Rudlaff*, 791 F.3d at 644 (quoting *Saucier v. Katz,* 533 U.S. 194, 206 (2001), qualified immunity shields Bronne from liability for his split-second judgment to tackle Bowen.  *Id*. ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines").

Further, Bronne's attempt to tackle Bowen did not immediately take him to the floor. Instead, the two briefly struggled until Bronne positioned himself behind Bowen, lifted and rotated him to his left side, and placed him on the floor.  *See* Bronne's declaration (Doc. No. 19-2 at PageID 199; Bronne Video).  Bronne's video confirms that Bowen repeatedly yelled "stop" as Bronne attempted to gain control of him.  Bronne Video 1.  Although it is not clear from Bronne's video when he punched Bowen, Bronne states he did so after Bowen resisted Bronne's effort to roll him onto his back.  *Id*. at PageID 200.  Considering the totality of the circumstances Bronne faced, an objective officer in his situation would reasonably conclude Bowen presented an immediate danger to Hawkins, her children, and to Bronne, and that tackling Bowen and punching him one time were reasonably necessary to subdue him.  *See Feagin v. Mansfield Police Dep't*, No. 24-3710, 2025 WL 2621665, at *4 (6th Cir.  Sep. 11, 2025) ("What is 'active' resistance? Physical struggles with the police qualify").  Consequently, Bronne's "split-second judgment" to tackle and punch Bowen did not constitute an unreasonable or gratuitous use of force.  *Cf. Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010) (whether police used excessive force in violation of the Fourth Amendment depends "not on the 'extent of the injury inflicted' but [on] whether an officer subjects a detainee to 'gratuitous violence.'" (quoting *Morrison v. Bd. Of Tr. Of Green Twp*., 583 F.3d 394, 407 (6th Cir. 2009))); *cf. VanPelt v. City of Detroit*, 70 F.4th 338,

16

339-40 (6th Cir. 2023) (officer used reasonable force by tackling a handcuffed suspect after he "took off running"); *Rudlaff*, 791 F.3d at 641-42 (officer's use of a taser or a knee strike against suspect who is actively resisting arrest does not qualify as excessive force).

Because Bronne did not use excessive force on Bowen in violation of his rights under the Fourth Amendment, qualified immunity shields Bronne from liability. *See VanPelt*, 70 F.4th at 341.

Lastly, considering separately Bowen's cross motion for summary judgment, *Lansing Dairy*, 39 F.3d at 1347 (the court must evaluate each party's motion for summary judgment "on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration"), his memorandum in support, and the exhibits or other evidence on which he relies, he has not shown there are no genuinely undisputed material facts that support his Fourth Amendment claims against Bronne or that there is no genuine dispute of material fact entitling judgment as a matter of law in his favor. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"). As a result, Bowen's motion for summary judgment against Bronne lacks merit.

### C.  Officers Kennedy and Heindl

Bowen contends that  summary judgment is warranted in his favor because Kennedy used excessive force on him by tasering him three times as he lay on the floor while multiple other officers were in the room, and by dislocating his finger "while in handcuffs."  Doc. No. 17 at PageID 168-69; *see* Doc. No. 3 at PageID 67.

Kennedy contends that summary judgment is warranted in his favor based on qualified immunity because (1) his use of the taser was objectively reasonable under the circumstances; and

(2) Bowen has failed meet his burden to show Kennedy violated his clearly established constitutional rights. Doc. No. 19 at PageID 189-91, 193-94.

"[I]t is *not* excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest." *Rudlaff*, 791 F.3d at 641 (emphasis in original); *see also Williams v. Sandel*, 433 Fed. App'x 353, 362-63 (6th Cir. 2011) (holding it is not excessive force to tase the suspect thirty-seven times, use batons, and pepper spray because he actively resisted arrest). Active resistance includes "refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Id.* at 641 (citing *Caie*, 485 Fed. App'x at 94, 96-97). It also includes "physically struggling with, threatening, or disobeying officers." *Cockrell v. City of Cincinnati*, 468 Fed. App'x 491, 495-96 (6th Cir. 2012) (collecting cases); *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022) (finding that plaintiff actively resisted when he repeatedly pulled his arm away from an officer to avoid handcuffing, even after officer warned he would be tased if he did not comply); *Hagans*, 695 F.3d at 507, 509-12 (collecting cases) (finding plaintiff actively resisted when officers tased plaintiff who refused to allow officers to secure his arms behind his back).

Conversely, a suspect does not actively resist arrest when he or she becomes compliant, does nothing to resist arrest, or is already detained. *Cf. Hagans*, 695 F.3d at 509; *Kijowski v. City of Niles*, 372 Fed. App'x 595, 599-600 (6th Cir. 2010) (no resistance); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (excessive force occurred when officers pepper sprayed a plaintiff who was handcuffed, had stopped resisting arrest, and posed no flight risk).

Kennedy did not violate Bowen's constitutional rights by tasing him multiple times to assist the other officers in subduing him. Kennedy's Video shows that as he entered the room, Bowen was laying on his back and yelling at Bronne to handcuff his wrists in front of his body. Kennedy Video. Bronne, holding Bowen's wrists, told him to stop resisting and roll over. Kennedy first

18

grabbed one of Bowen's wrists, but he quickly let go.  *Id*.  He joined Bronne, and other soon-arriving officers, in telling Bowen to roll over.  *Id*.  Bowen did not comply with the officers' repeated orders to roll over.  The officers were able to roll Bowen onto his side, but he continued to physically resist their efforts to roll him onto his stomach and facing down on the floor so they could secure his hands behind his back and handcuff him.  *Id*.;  Bronne Video 1.

Kennedy warned Bowen a total of three times to roll over or else he would be tased.[11] Kennedy Video.  Bowen defiantly responded, "What do ya mean I'm gonna get tased?  I'm giving you my arms, dumbass."  *Id*.  For safety reasons, it was reasonable for the officers to order Bowen to roll over and to use physical force to roll him over when he refused and physically resisted.  As Bronne explains in his declaration, "[h]andcuffing to the front of the body fails to inhibit or sufficiently mitigate the risk a suspect can pose to officers and others.  Additionally, the handcuffs themselves can be utilized as a weapon."  Doc. No. 19-2 at PageID 200.

Under the totality of the circumstances, including Bowen's physical resistance, his size and apparent strength, his noncompliance with the officers' orders to roll over, his insistence the officers handcuff his wrists in front of his body, the danger such handcuffing can pose to officers, and the difficulty the officers had in physically rolling Bowen over and handcuffing him due to his physical resistance, an objective officer in Kennedy's situation would understand that tasing Bowen would not constitute an excessive or unreasonable use of force.  *See Rudlaff*, 791 F.3d at 641; *Bell*, 37 F.4th at 368 (6th Cir. 2022); *Cockrell*, 468 Fed. App'x at 495-96 (collecting cases).

Bowen contends Bronne's video footage shows that he was fully restrained with both hands held down to the floor, leaving him unable to roll over.  Doc. No. 22 at PageID 228.  Bronne's video conclusively establishes otherwise.  Bronne's video reveals that when Kennedy arrived in

---

[11] Video evidence shows there was time for Bowen to comply with the officers' orders between the first and second use of the taser.  The video evidence does not establish when, or if, Kennedy tased Bowen a third time.  *See* Bronne Video 1; Kennedy Video.

19

the room, Bowen's hands were not held to the floor but, instead, Bronne held Bowen's wrists and arms in the air above his chest. Bronne Video 1. As other officers arrived in the room, Bowen did not comply with officers' orders to roll over, and he loudly and actively resisted their attempts to roll him over to handcuff his hands behind his back. *Id.*; *see* Kennedy Video. Even after Kennedy tased Bowen, he continued to physically resist and yell at officers as they struggled to roll him over. *See* Kennedy Video. Because he "actively resist[ed] arrest and refus[ed] to be handcuffed," *Hagans,* 695 F.3d at 509, Kennedy's split-second judgment to tase Bowen constituted a reasonable use of force. Again, "it is not excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest." *Rudlaff*, 791 F.3d at 641 (emphasis in original).

Bowen alleges the video evidence shows Kennedy dislocated his finger after Bowen was secured in handcuffs. This is incorrect. A close viewing of Kennedy's Video shows that once officers rolled Bowen so he was face down on the floor, one officer handcuffed his left hand behind his back. This officer then began to connect a second set of handcuffs to the first.[12] While this was happening, Kennedy's Video reveals the injury (an apparent dislocation) to Bowen's finger on his right non-cuffed hand. *See* Kennedy Video at 3:49-53. This establishes, contrary to Bowen's belief, that the injury (a finger dislocation) occurred before both his hands were secured in handcuffs. *See id*. Kennedy's Video also shows no gratuitous violence by Kennedy or Heindl or any officer helping to handcuff Bowen. The Kennedy Video instead shows first Kennedy and then Heindl momentarily held Bowen's fingers. Kennedy did so to assist in lifting Bowen's hand so the handcuffs could be wrapped fully around his wrist—*i.e.*, while Bowen was still being handcuffed—and Heindl immediately let go of Bowen's fingers as soon as the handcuffs clicked

---

[12] It appears the officers connected two sets of handcuffs lengthwise to facilitate handcuffing Bowen's hands together and to avoid possibly injuring him. *See* Kennedy Video.

into place, thus securing Bowen's hands behind his back.  *See id*. at 3:53-4:03.  Consequently, Kennedy's Video shows neither he nor Heindl injured or dislocated the finger on Bowen's right hand before officers secured him in both handcuffs—nor after securing him, as Bowen alleges. Further, and again, Kennedy's Video shows no gratuitous violence by Kennedy or Heindl or any officer helping to handcuff Bowen and no indication that the force either officer used was objectively unreasonable under the circumstances.  *See VanPelt*, 70 F.4th at 340-41; *Kapuscinski v. City of Gibraltar*, 821 Fed. App'x 604, 613-14 (6th Cir. 2020) ("[T]he law allows officers sufficient breathing room to respond adequately to threats to themselves and others, even when those responses have unintended fatal consequences").

In sum, because the force Kennedy and Heindl used when arresting Bowen and securing him in handcuffs was objectively reasonable, qualified immunity shields each of them from Bowen's claim that they violated his rights under the Fourth Amendment.  *See VanPelt*, 70 F.4th at 341 ("Officer Layne's use of force was reasonable, and he did not violate [the plaintiff's] constitutional rights.  Thus, Officer Layne is entitled to qualified immunity").  Summary judgment is therefore warranted in Bronne's and Kennedy's favor.  *See id*.

Lastly, considering separately Bowen's cross motion for summary judgment, *Lansing Dairy*, 39 F.3d at 1347, his memorandum in support, and the exhibits and other evidence on which he relies, he has not shown there are no genuinely undisputed material facts that support his Fourth Amendment claims against Kennedy or Heindl or that there is no genuine dispute of material fact entitling him to judgment as a matter of law in his favor.  *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").  As a result, Bowen's motion for summary judgment against Kennedy and Heindl lacks merit.

## V.

### A.  Remaining Claims

Bowen's remaining claims are based on what began to occur when Bronne knocked on the front door to Bowen's home and Bowen opened his front door.  Doc. No. 22 at PageID 225.  Liberally construing Bowen's *pro se* filings in his favor, he claims the Fourth and Fifth Amendments allowed him not to step outside his home, not to speak with Bronne and, instead, to close the door.[13]  Doc. No. 22 at PageID 225.  Bowen further contends the video footage establishes Bronne never gave him a lawful order and never told him he was under arrest.  *Id.*

### B.  Warrantless Entry

"[W]arrantless entries into a home presumptively violate the Fourth Amendment." *Howell v. McCormick*, ---F.4th---, 2025 WL 2434620, at *4 (6th Cir. Aug. 25, 2025) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  This presumption applies "unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City*, 547 U.S. at 403; *Smith v. Stoneburner*, 716 F.3d 926, 929–30 (6th Cir. 2013)  ("Police officers, it has long been true, may not enter a private home without a warrant absent an exigency or consent." (citing *Payton v. New York,* 445 U.S. 573, 590 (1980)).  "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury.  The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Brigham City*, 547 U.S. at 403 (citation modified); *see Williams v. Maurer*, 9 F.4th 416, 431 (6th Cir. 2021).

To determine whether a law enforcement officer faced an emergency sufficient to justify entering a home without a warrant, courts examine the totality of the circumstances without regard

---

[13] Bowen's complaint only asserts his Fourth Amendment excessive force claim.  *See* Doc. No. 3.

for "the officers' subjective intent or the seriousness of any crime they are investigating[.]" *Williams*, 9 F.4th at 432 (quoting *Mich. v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam)). "Rather, it requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Id.* (citation modified).

In the present case, considering the totality of the circumstances and given the information Bronne heard from Bowen's neighbors—including (in part) their reports of Bowen's recent threatening conduct towards Hawkins, and the fact, confirmed by Bronne's video footage, that a woman screamed from inside Bowen's residence and can be heard crying after Bronne knocked on the door—a reasonable basis existed for an objective officer to conclude that a woman, likely Hawkins, or her children (based on what Bronne had learned from the neighbors) were in need of immediate protection from Bowen. *See Brigham City*, 547 U.S. at 403 ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury"); *see Schreiber v. Moe*, 596 F.3d 323, 329-30 (6th Cir. 2010) ("Under the exigent circumstances exception concerning the threat of violence to officers or others, police officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury").

Caution is warranted in reaching this conclusion because, generally in § 1983 cases, the question of whether exigent circumstances excuse a warrantless entry into a home is one "for the jury provided that, given the evidence on the matter, there is room for a difference of opinion." *Ingram*, 185 F.3d at 587 (quoting *O'Brien v. City of Grand Rapids,* 23 F.3d 990, 998 (6th Cir. 1994)). In the present case, Bronne's video footage documents the information the neighbors reported to him about Hawkins seeking refuge in their home, her fear of Bowen, and the physical force he had used to enter their home followed by his refusal to leave when told to do so. *See* Bronne Video II. Bronne's video footage also confirms that a woman screamed from inside

Bowen's home and can be heard crying after Bronne knocked. *Id*. Additionally, Bowen, upon slightly opening the door and seeing Bronne, who wore a police uniform, quickly shut the door and then briefly pushed the door back towards Bronne. *See id*. This video evidence leaves no room for a difference of opinion, *see id*.—*i.e.*, no genuine issue of material fact—regarding the reasonable basis for an objective officer to conclude that exigent circumstances existed—specifically, the danger of harm to the woman who screamed, again likely Hawkins, or her children or Officer Bronne.

Accordingly, summary judgment is warranted in Bronne's favor on the claim he violated Bowen's rights under the Fourth Amendment by entering his home without a warrant. *See Howell*, 2025 WL 2434620, at *5 (Although the question in civil cases of whether exigent circumstances existed is usually one reserved for the jury, "we have added that (as with any question of historical fact) we may resolve this question at the summary-judgment stage if a reasonable jury could give only one answer").

## C. Officer Fox

Bowen alleges in his complaint that officers used excessive force on him, but he acknowledged he was "unable to identify which officer had dislocated [his] right hand finger officer (Joseph Kennedy or officer Jordan Fox)[.]" Doc. No. 3 at PageID 66 (citation modified).

Defendants contend summary judgment is warranted in Fox's favor concerning the injury to the finger on Bowen's right hand. Doc. No. 19. Bowen acknowledges that after viewing the video footage, Officer Fox did not injure his finger. Doc. No. 17 at PageID 163. Because of this acknowledgement, there is no genuine issue concerning the fact that Fox did not cause this injury. As a result, summary judgment is warranted in Fox's favor on Bowen's Fourth Amendment excessive force claim.

24

### D.  The Fourth and Fifth Amendments

Bowen maintains that after Officer Bronne knocked on his front door, he did not act in any hostile manner and had rights under the Fourth and Fifth Amendments to close the door and not step outside his home.  Doc. No. 22 at PageID 225.  Bowen claims Bronne violated those rights by forcibly entering his home without a warrant.  *Id*.

As discussed above and assuming, in Bowen's favor, he did not act in any hostile manner by refusing to step outside and, instead, closing his front door, this conduct did not eliminate the exigent circumstances—especially the danger of violence he presented to those inside his home—that permitted Bronne to enter Bowen's home without a warrant.  *See supra*, § V(B).  Moreover, although Bowen attempts to attach the Fifth Amendment to his refusal to talk with Bronne and, instead, to remain inside his home, his actions did not implicate the Fifth Amendment.  *See Vega v. Tekoh*, 597 U.S. 134, 152 (2022) ("[A] violation of *Miranda* is not itself a violation of the Fifth Amendment, and … we see no justification for expanding *Miranda* to confer a right to sue under § 1983").  Additionally, Bronne's warrantless entry into Bowen's home based on exigent circumstances carries no Fifth Amendment implication given the absence of a self-incriminating statement by Bowen and in the presence of the exigent circumstances Bowen had created.

### VI.

For the reasons stated herein, Defendants' cross motion for summary judgment (Doc. No. 19) is **GRANTED**, and Bowen's motion for summary judgment (Doc. No. 17) is **DENIED**.  This case is **TERMINATED** on the docket.

Pursuant to 28 U.S.C. § 1915(a)(3), the Court hereby **CERTIFIES** to the United States Court of Appeals for the Sixth Circuit that an appeal by Bowen would be frivolous and not taken in good faith.  This case is also not particularly complex, and Bowen is sufficiently capable of representing himself.  *See Lavado v. Keohane*, 992 F.2d 601, 605-06 (6th Cir. 1993).

Consequently, Bowen should not be permitted to proceed *in forma pauperis* on appeal, and the Court **DENIES** Bowen a certificate of appealability.

      **IT IS SO ORDERED.**

September 24, 2025                           s/*Michael J. Newman*
                                                Hon. Michael J. Newman
                                                United States District Judge